IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOEL JENSEN,

Petitioner,

v.

JEFF PREMO,

Respondent.

Case No. 6:16-cv-02049-AN

OPINION AND ORDER

Julie Pitt Vandiver
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

Attorney for Petitioner

Ellen F. Rosenblum, Attorney General
Nick M. Kallstrom, Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

Attorneys for Respondent

NELSON, District Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his Benton County criminal judgment dated February 20, 2009. For the reasons that follow, the Amended Petition for Writ of Habeas Corpus (#53) is denied.

**BACKGROUND**

Petitioner was a family friend of a married couple, Tim Hardin and Deborah Davis, who were 30 years senior to Petitioner. The three had met in 2001 and, over time, Petitioner came to rely on Hardin and Davis for various forms of support. In June, 2007, Petitioner moved into the Hardin-Davis home. One month later, on July 23, 2007, Davis disclosed to Hardin that she had been having an affair with Petitioner since November 2006 when the two had taken a camping trip together. Trial Transcript, p. 573. After this disclosure, the couple told Petitioner he needed to move out of the home.

After moving out of the residence, Petitioner continued to telephone Hardin and Davis. On August 5, 2007, he called, spoke with Davis, and told her he was thinking about committing suicide. As a result, Davis took Petitioner to a local hospital where he stated that he did not really intend to commit suicide, but could not understand why his relationship with Davis had to end. *Id* at 373-74. Petitioner was particularly distraught over the breakup because he was socially awkward and, despite being 28 years of age, had never had a girlfriend or kissed a woman prior to his relationship with Davis. *Id* at 572. Jeffrey Sneddon, a licensed clinical social worker, met with Petitioner, noticed that he had difficulty interpreting social cues, and wondered if he might have Asperger's Disorder.[1] *Id* at 375, 381.

[1] Sneddon phrased this as a "rule-out of Asperger's Disorder," which means that the issue is neither confirmed nor excluded, and remains a possible condition that requires further exploration. *See* Respondent's Exhibit 124, p. 4.

Two days later, Davis told Petitioner that she and Hardin would not be communicating with him anymore. She did, however, agree to lend Petitioner a pickup truck for a date that she had arranged for him with another woman later that night. The woman, however, cancelled the date and Petitioner returned the truck to the Hardin-Davis home. Instead of leaving the keys in a flowerpot outside as Davis had instructed, he came to the front door. Davis went outside to speak with him and, almost immediately, the two began speaking with raised voices. Petitioner proceeded to enter the house, and Davis yelled to Hardin to call 9-1-1. Petitioner encountered Hardin in the primary bedroom and struck him repeatedly in the head with a firearm. Hardin was able to escape, fled to a neighbor's home to summon help, and heard two gunshots separated by a few seconds. Petitioner had shot and killed Davis, then turned the gun on himself and shot himself under the chin. The bullet exited out his forehead, but he survived.

Based upon the foregoing, the Benton County Grand Jury charged Petitioner with one count of Murder, one count of Assault in the Second Degree, and four counts of Burglary in the First Degree. Respondent's Exhibit 102. Petitioner was represented by two attorneys and, on March 26, 2008, defense counsel gave notice of Petitioner's intent to introduce expert testimony to establish the affirmative defense of Extreme Emotional Disturbance ("EED").[2] The defense retained psychologist Stephen Scherr to evaluate Petitioner, and Dr. Scherr provided his written report to the defense on May 12, 2008. He diagnosed Petitioner with numerous maladies and noted that he suffered from "long-term anxiety beginning in childhood" and was "a socially

2 Under ORS 163.135(1)(a), a criminal defendant establishes the affirmative defense of EED if "the homicide was committed under the influence of extreme emotional disturbance if the disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act and if there is a reasonable explanation for the disturbance." A defendant who proves an EED defense establishes a mitigating circumstance that reduces his criminal liability from what would otherwise be intentional murder to manslaughter in the first degree. ORS 163.118.

awkward, somewhat disorganized and naive young man." Respondent's Exhibit 115, p. 16. Dr. Scherr concluded that at the time of Davis' death, Petitioner was functioning "with an extreme emotional disturbance (ORS 163.115) . . . that was not the result of his own intentional, knowing, or a reckless or criminally negligent act." *Id* at 18. Although Dr. Scherr had reviewed Dr. Sneddon's notes that indicated Petitioner potentially had Asperger's syndrome, Dr. Scherr's report included no such diagnosis.

Seven months later, Petitioner proceeded with a bench trial. The defense called Sneddon to recount the social history Petitioner had related to him during his hospital visit on August 5, 2007. He testified that he put Asperger's as a "rule-out" that required further exploration because Petitioner was shy, demonstrated difficulty with picking up on social cues, was not making proper eye contact. Trial Transcript, pp. 375-77, 381. He explained,

> When I talked with him about his social history he had indicated that he had a difficulty with making friends, he had a hard time with his peer group. He had talked about some difficulties in communication when he was younger, and then he – as far as just the – just his observation of watching him as far as normal eye contact and smiling and – or his affect was not normally what would you put as far as congruent to what was happening for him.

Trial Transcript, pp. 375-76. Sneddon also testified that Asperger's is essentially high-functioning autism. *Id* at 378.

The defense also called Dr. Scherr. Scherr testified that Petitioner had odd social habits, including a penchant for smiling inappropriately. *Id* at 561. At that point, the State objected on the basis that Petitioner's "personality, which shyness clearly is, are not admissible" to support an EED defense under Oregon law. *Id*. The trial judge sustained the objection, and one of Petitioner's attorneys continued to press the issue:

> Defense: Some of these factors go to form [Scherr's] diagnosis in this case, which is what he's attempting to do, is make a diagnosis of Mr. Jensen at the time, and to do that he has to look at background materials and factors that are not necessarily what you'd call personality characteristics. Certainly Asperger's is relevant to – to this situation.
>
> Court: There's no evidence of Asperger's in the case that I'm – I'm aware of.
>
> Defense: That was – Jeffrey Sneddon testified that he –
>
> Court: He ruled it out.
>
> Defense: That's in his notes.
>
> Court: He ruled it out.
>
> Defense: No, he didn't say rule it out. Rule out – I'll ask Doctor Scherr what "rule out" means.
>
> State: Your Honor, my recollection is that Mr. Sneddon said that Asperger's should be ruled out, that it's something that should be evaluated but –
>
> Court: That was my recollection of the testimony.
>
> Defense: Right. He didn't say he ruled it out. He said in fact it was a consideration, and all the things that Doctor Scherr is talking about are things that Mr. Sneddon talked about.
>
> Court: Well, he may testify with regard to Asperger's to the extent that that may be a mental handicap, but other characteristics such as shyness would not be admissible and I'll sustain the State's objection on those grounds.

*Id* at 562-63.

Shortly thereafter, the prosecutor objected when Scherr testified to a diagnosis of Asperger's syndrome for Petitioner. The objection was based on the fact that Scherr had not, in fact, diagnosed Asperger's within the report that the defense had disclosed to the prosecutor. Scherr admitted that such a diagnosis was not contained in his report, but noted that the report

had mentioned petitioner "as a high functioning autistic, which is a component of Asperger's." *Id* at 563; Respondent's Exhibit 115, p. 8. For her part, defense counsel conceded that Scherr had not made an Asperger's diagnosis at the time he produced his report. Trial Transcript, p. 566. When the Court asked whether the new diagnosis had been shared with the State, the prosecutor stated, "this is the first time I'm hearing of it, is as the doctor is talking." *Id*. Due to the lack of notice to the prosecution, the trial judge granted the State's motion to preclude Dr. Scherr from testifying as to a diagnosis of Asperger's syndrome. *Id* at 566-67.

Dr. Scherr proceeded with his testimony, stating that he had reviewed the police reports, all mental health reports, medical reports, and interviewed members of Petitioner's family, and his pastor since the age of 17. This led him to diagnose Petitioner with major depressive disorder with psychotic features, dysthymic disorder, post-traumatic stress disorder, alcohol abuse, anxiety, and an avoidant personality disorder with dependent features. Respondent's Exhibit 124, p. 4. Dr. Scherr explained that Petitioner suffered from significant social anxiety, had trouble connecting with his peers, and felt that animals were among his closest friends. Trial Transcript, pp. 572-75. He opined that when Davis broke up with Petitioner, it was particularly devastating for him given his social difficulties. Dr. Scherr explained that the loss of the relationship was more than Petitioner could bear, and he experienced an episode of psychotic depression that led to Davis' homicide. *Id* at 574-77, 599-600.

The prosecution called its own expert witness, psychologist Dr. Frank Colistro. He expressed his opinion that EED violence is reactive in nature, a response to a sudden stressor for which a person is unprepared. *Id* at 661. He explained that Petitioner's actions did not reflect reactive violence. Instead, when Davis broke off the relationship, "[w]e then have obsessive following, stalking type behavior, further manipulative behavior." *Id* at 663. In the days leading

up to the homicide, Petitioner was very agitated but suddenly became calm, an indication that he had "come up with a plan to heal himself." *Id*. Colistro stated that this led to proactive violence that was not the result of EED.

The trial judge rejected the EED defense, convicted Petitioner on all counts, and sentenced him to life in prison with the possibility of parole after a minimum of 25 years on the Murder charge. *Id* at 784. The judge imposed a consecutive 70-month sentence for the Assault in the Second Degree charge related to Petitioner's attack on Hardin, and a 60-month concurrent sentence on the four Burglary convictions which all merged for purposes of sentencing. *Id* at 784-85. Petitioner took a direct appeal, but later voluntarily dismissed the appeal. Respondent's Exhibits 104 & 105.

Petitioner next filed for post-conviction relief ("PCR") in Marion County where the PCR court denied relief on all of his claims. Respondent's Exhibit 142. The Oregon Court of Appeals issued a written *per curiam* opinion wherein it reversed and remanded the case to the Marion County Circuit Court due to the inadequate form of the PCR judgment. *Jensen v. Premo*, 282 Or. App. 905, 385 P.3d 1276 (2016). On remand, the PCR court once again denied relief and issued a judgment that conformed with Oregon law. Respondent's Exhibit 149. The Oregon Court of Appeals affirmed that decision without opinion, and the Oregon Supreme Court denied review. Respondent's Exhibits 154 & 155.

Following the conclusion of Petitioner's state court proceedings, on August 27, 2020, this Court appointed counsel to represent Petitioner in this federal habeas case. With the assistance of counsel, Petitioner filed his Amended Petition for Writ of Habeas Corpus (#53) in which he raises six grounds for relief with multiple sub-claims. Respondent asks the court to deny relief on the Amended Petition because: (1) with the exception of Ground II, Paragraph E, Petitioner's

claims are either untimely, or they are procedurally defaulted by virtue of his failure to fairly present them to Oregon's state courts for consideration; and (2) the PCR court properly and reasonably denied relief on Ground II(E).

**DISCUSSION**

**I. Standard of Review**

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410. Twenty-eight U.S.C. § 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Twenty-eight U.S.C. § 2254(d)(2) allows a petitioner to "challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). A state court renders an unreasonable determination of the facts if it "plainly misapprehends or misstates the record in making its findings or where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Andrew v. Davis,* 944 F.3d 1092, 1107 (9th Cir. 2019) (internal quotations omitted). A federal habeas court cannot overturn a state court decision on factual grounds "unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This is a "'daunting standard—one that will be satisfied in relatively few cases,' especially because we must be 'particularly deferential to our state-court colleagues.'" *Hernandez v. Holland*, 750 F.3d 843, 857 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)).

## II. <u>Unargued Claims</u>

As mentioned above, with the assistance of counsel Petitioner filed an Amended Petition in which he raises six grounds for relief. However, in his briefing he argues only his Ground II(E) claim that one of his trial attorneys was ineffective for failing to adequately consult with Dr. Scherr to ensure he made an appropriate diagnosis. Not only has he not carried his burden of proof as to his unargued claims, but the Court finds Respondent's procedural arguments to be well taken. Accordingly, Petitioner's unargued claims do not entitle him to relief. *See* 28 U.S.C. § 2248 ("The allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."); *see also Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (Petitioner bears the burden of proving his claims).

**III. Ground II(E): Failure to Adequately Consult with Expert Witness**

Petitioner alleges that one of his trial attorneys was constitutionally ineffective when she failed to properly prepare his defense. Specifically, he believes she should have had him evaluated for, and diagnosed with, Asperger's syndrome. He points out that he admitted his guilt as to Davis' homicide and waived his right to a jury trial, relying upon his attorneys' ability to present an EED defense to mitigate his culpability for the crime. Under these circumstances, he contends that competent counsel would have been aware of the importance of an Asperger's diagnosis and ensured it was appropriately included in Dr. Scherr's report so that Dr. Scherr could testify to that diagnosis at trial.

The Court uses the general two-part test established by the Supreme Court to determine whether Petitioner received ineffective assistance of counsel. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). First, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, Petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is whether Petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland,* 466 U.S. at 693). When *Strickland's* general standard is combined with the standard of review governing

28 U.S.C. § 2254 habeas corpus cases, the result is a "doubly deferential judicial review." *Mirzayance*, 556 U.S. at 122.

During Petitioner's PCR proceedings, he introduced expert witness evidence from Dr. Norvin Cooley, a clinical psychologist. Dr. Cooley stated in his report that Petitioner "clearly suffers from a pervasive developmental delay and that based on the diagnostic criterial applicable, at the time of the evaluation, a diagnosis of Asperger's Disorder would have been applicable." Respondent's Exhibit 124, p. 13. With respect to how such a diagnosis might have affected Petitioner's trial, Cooley opined that while one could not predict its impact with certainty, the trier of fact did not have the opportunity to understand the impact such a diagnosis would have had on Petitioner's development and his behavior at the time he killed Davis. *Id* at 14.

The PCR court denied relief on Petitioner's claim as follows:

> The Trial Court had all the clinical information before it to evaluate the testimony of Dr. Scherr and Dr. Colistro. Dr. Cooley's expert testimony did not disagree with Dr. Scherr's expert testimony or the testimony of Jeffrey O. Sneddon, the licensed social worker.
>
> Petitioner has failed to meet his burden in proving that trial counsel was ineffective regarding the Asperger's diagnosis given the symptoms were testified to by two mental health professionals and advanced by another. The Petitioner has failed to establish that he was prejudiced. Petitioner has failed to prove the claim.

Respondent's Exhibit 149, pp. 4-5.

As an initial matter, Petitioner faults trial counsel for not confirming that Dr. Scherr's report contained the Asperger's diagnosis, but this contention necessarily relies upon Dr. Scherr having made a timely Asperger's diagnosis for inclusion in the report. Nothing in the record shows that Dr. Scherr simply forgot to add the diagnosis to his report. To the contrary, defense

counsel expressed her belief that Dr. Scherr diagnosed Petitioner with Asperger's syndrome after he produced his report. When the prosecutor objected to Dr. Scherr's testimony regarding his Asperger's diagnosis, defense counsel specifically stated, "I don't think he made the diagnosis at the time but he has in retrospect . . . and, what he's saying, I believe, is that at the time he didn't think of that. . . ." Trial Transcript, p. 566.

During Petitioner's PCR hearing, when the State's attorney asked Dr. Cooley whether Dr. Scherr's diagnosis of Asperger's "was an 'a-ha moment'" that occurred to him during the course of his trial testimony, Dr. Cooley responded, "That's certainly what it appeared to be, yes." Respondent's Exhibit 141, p. 150. It was Dr. Cooley's opinion that Dr. Scherr reached this new diagnosis either during or shortly before trial, and "if you go through his transcript, he basically says, oops, you know, I should have [diagnosed Asperger's syndrome]." *Id* at 139, 150. Thus, the record does not support the proposition that Dr. Scherr diagnosed Petitioner with Asperger's in time to include it in the report he produced approximately nine months prior to trial. Consequently, counsel could not reasonably have been expected to ensure the inclusion of such a diagnosis when she checked the report for errors.[3]

In addition, Petitioner does not point to any materials counsel improperly withheld from Dr. Scherr that prevented him from making a timelier diagnosis. In the context of an ineffective assistance of counsel claim, the inquiry is whether trial counsel provided Scherr with a reasonable opportunity to diagnose Petitioner. *See, e.g., Earp v. Cullen,* 623 F.3d 1065, 1077 (9th Cir. 2010) ("An expert's failure to diagnose a mental condition does not constitute ineffective

3 Counsel did, in fact, review the report and caught a typographical error wherein Dr. Scherr had mistakenly indicated in his report that Petitioner had "homicidal thoughts" with respect to Davis. After counsel flagged the issue, Dr. Scherr corrected the report to read that Petitioner had experienced "no homicidal thoughts" toward Davis. *Compare* Respondent's Exhibit 115 at 13 *with* Respondent's Exhibit 115 at 14; Trial Transcript, pp. 549-50.

assistance of *counsel*, and [Petitioner] has no constitutional guarantee of effective assistance of experts.") (emphasis in original); *Babbitt v. Calderon,* 151 F.3d 1170, 1174 (9th Cir. 1998) (counsel is obligated only to see that a psychological evaluation takes place, not ensure the trustworthiness of the expert's conclusions). All indications are that she did so, including when she supplied Dr. Scherr with Jeffrey Sneddon's notes that mentioned the possibility of Petitioner having Asperger's syndrome. *See* Respondent's Exhibit 115, pp. 1-3; Trial Transcript, p. 565; Memo in Support (#99), p. 16. In this respect, counsel's performance did not fall below an objective standard of reasonableness.

Even assuming trial counsel could be faulted for the absence of an Asperger's diagnosis in Dr. Scherr's report, Petitioner must still prove that counsel's error prejudiced him. Although Dr. Scherr was not permitted to testify regarding an Asperger's diagnosis, he and Sneddon both testified that Petitioner demonstrated symptoms that were consistent with Asperger's syndrome and which supported the EED defense. Respondent's Exhibit 149, pp. 4-5. Dr. Scherr addressed issues such as Petitioner's inability to read social cues, social immaturity and resulting struggles, major anxiety condition that impacted his social interactions, his perspective that animals were among his closest friends, his moral aversion to hugging anyone to whom he was not related, and his lack of any romantic relationship prior to his involvement with Davis. Trial Transcript, pp. 561-80. As discussed above, Sneddon had previously testified that a potential diagnosis for Asperger's needed to be explored given that Petitioner demonstrated many of these same characteristics. Dr. Scherr also stated during questions in aid of objection that while his report did not include an Asperger's diagnosis, it did mention Petitioner "as a high functioning autistic, which is a component of Asperger's." *Id* at 565. This mimicked Sneddon's testimony that Asperger's Syndrome amounts to high-functioning autism. *Id* at 378. It is unclear why Dr. Scherr

could not have referenced his autism diagnosis in lieu of an Asperger's diagnosis at trial with no adverse impact on Petitioner. As the PCR court determined, the trial judge had all of the clinical information before him, and Dr. Cooley did not disagree with the contents of Dr. Scherr's report or the testimony of Jeffrey Sneddon. Respondent's Exhibit 149, pp. 4-5. Given all of the foregoing, it is difficult to see how an Asperger's diagnosis in Dr. Scherr's report would have altered the outcome of this case.

Moreover, during Petitioner's PCR proceedings, his expert described the relatively limited benefit of allowing Dr. Scherr to testify to an Asperger's diagnosis. Dr. Cooley testified that an "EED is a very complicated defense and it's hard frankly for juries to understand it." Respondent's Exhibit 141, p. 142. He concluded that "any time that you can provide a trier of fact with a way to shorthand the data that makes the data understandable . . . it's very helpful." Respondent's Exhibit 141, p. 142. This case did not, however, involve a jury, and the trial judge was in a much better position than an average juror to evaluate how the evidence adduced at trial fit into Oregon's EED defense without having the "shorthand" of an Asperger's diagnosis to which to refer.

Finally, Dr. Scherr's inability to testify to an Asperger's diagnosis did not impact the trial judge's consideration of the ultimate issue: whether a reasonable person enduring Petitioner's afflictions and characteristics, who had recently experienced the unexpected loss of his first romantic relationship, suffered from an extreme emotional disturbance at the time he killed his former romantic partner. There was ample opportunity for the defense to present medical evidence equivalent to the Asperger's diagnosis that Dr. Scherr did not make, and trial counsel accurately summed this up when she stated that "additional testimony regarding Asperger's was not particularly helpful or relevant, and . . . it would not have had any effect on the outcome of

the case, especially considering the nature of the defense and the evidence presented at trial." Respondent's Exhibit 135, p. 3. For all of the foregoing reasons, the PCR court did not make an unreasonable determination of the facts, nor did it unreasonably apply clearly established federal law. At a minimum, the decision was not so unreasonable that no fairminded jurist could agree with it. Habeas corpus relief is therefore not warranted.

## CONCLUSION

For the reasons identified above, the Amended Petition for Writ of Habeas Corpus (#53) is denied. The Court declines to issue a Certificate of Appealability on the basis that Petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

2/21/2024
DATE

Adrienne E. Nelson

Adrienne Nelson
United States District Judge